BOND DRUG COMPANY OF ILLINOIS, Plaintiff-Appellant, v. AMOCO OIL COMPANY, Defendant-Appellee.

First District (3rd Division)   No. 1—93—0759

Opinion filed August 9, 1995.

David J. Krupp and James H. Bowhay, both of Neal, Gerber & Eisenberg, of Chicago, for appellant.

Jay D. Stein, of Stein & Stein, and Louis R. Hegeman, of Gould & Ratner, both of Chicago, for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Bond Drug Company of Illinois (Bond), filed a declaratory judgment action against defendant, Amoco Oil Company (Amoco), seeking a judgment that the contract between the parties is valid, specific performance of the contract and other relief. Amoco filed a counterclaim seeking rescission of the contract and a judgment that it be excused from performance of the contract because of unconscionability. The trial court granted Amoco's motion for summary judgment and denied Bond's motion for summary judgment. Bond has appealed. We reverse the summary judgment in favor of Amoco; reverse the denial of Bond's motion for summary judgment; and remand the case for another hearing and reconsideration of Bond's motion for summary judgment and for further proceedings.

Amoco owned a parcel of real estate at the corner of Fairbanks and Ohio streets (the Premises) in Chicago. The Premises were occupied by an Amoco gas station pursuant to an Amoco lease arrangement. As a result, there were underground gasoline storage tanks on the Premises. On December 21, 1984, Amoco entered into a contract (Exchange Agreement) with Bond concerning the Premises. Bond is a subsidiary and real estate arm of Walgreen Company (Walgreen). Bond wanted to acquire the Premises as a site for a Walgreen drug store.

The Exchange Agreement provides, in part, that Bond is to deposit the purchase price of $1,175,000 into an escrow account; Amoco is to designate a tract or tracts of land it desires to acquire in exchange for the Premises; the exchange tract or tracts shall have an aggregate value of approximately $1,175,000; Bond is to purchase the exchange tract or tracts with the funds deposited in the escrow account, and then convey the tract or tracts to Amoco; the final closing under the Exchange Agreement is to take place two years after Bond deposits the $1,175,000 in the escrow account; and at the final closing Amoco will convey title to the Premises to Bond, and Amoco will receive any amount of money remaining in the escrow account. Paragraph 17 of the Exchange Agreement provides that if zoning, building, fire or health code violations are found to exist on the Premises prior to Bond taking title and possession, Amoco shall correct them.

After executing the Exchange Agreement, in 1985 Bond paid an additional $100,000 to Amoco's gasoline station lessee of the Premises for a waiver of the lessee's right of first refusal on any sale of the Premises by Amoco. On October 7, 1985, Bond deposited the $1,750,000 into the escrow account. In 1986, Amoco designated the exchange tract of land it desired in Wauwatosa, Wisconsin, which was purchased by Bond for Amoco with funds from the escrow account. Amoco has since had use and possession of that tract for a gas station.

In September 1987, shortly before the final closing under the Exchange Agreement, an Amoco lawyer charged with closing the transaction notified Bond that Amoco wanted to test the Premises for groundwater contamination that might have been caused by leaking underground gasoline storage tanks. Thereafter, because of Amoco's requests, the final closing was repeatedly deferred. On May 27, 1988, Amoco found that there was environmental contamination on the Premises that would have to be corrected. On April 17, 1989, pursuant to the Illinois Environmental Protection Act (EPA), the Illinois Environmental Protection Agency sent Amoco a notice of discharge or release of petroleum into the environment at the Premises caused by leaking underground gasoline storage tanks. The EPA requires Amoco to correct the EPA violations existing on the Premises. See 415 ILCS 5/22.18 (West 1992).

Amoco has spent $532,000 to clean up the Premises contamination and surmises that it could cost as much as an additional $500,000 to complete the job. The record suggests, however, that the Premises have appreciated in value between the execution of the Exchange Agreement and the discovery of the Premises contamination; and the record suggests a possibility that if the Exchange Agreement is nullified, Amoco could either develop the site with an office building and sell it to a third party or sell the Premises to a third party who would erect an office building on the site.

On November 17, 1989, Amoco advised Bond that it would not convey the Premises to Bond as provided in the Exchange Agreement and that it considered the Exchange Agreement terminated because of the unexpected cost of having to correct the Premises contamination. Attempts by Bond to persuade Amoco to fulfill the terms of the Exchange Agreement failed and this case ensued. The $1,175,000 that Bond put into the escrow account remains in the account except for the money Bond used to acquire the Wauwatosa tract for Amoco. Bond has fully performed its obligations under the Exchange Agreement and desires to go ahead with the final closing of the Exchange Agreement.

■ The first issue that must be addressed on appeal is whether paragraph 17 of the Exchange Agreement is applicable to the dispute between the parties. Paragraph 17 provides:

"AMOCO warrants that AMOCO has received no notices from any city, village or other governmental authority of zoning, building, fire or health code violations in respect to the PREMISES that have not been heretofore corrected and if any violations occur or notices are received as to the same prior to the time BOND takes title and possession, AMOCO shall promptly advise BOND of same and AMOCO shall correct same, unless same is due to BOND's fault. If same is due to BOND's fault, BOND shall promptly cause the violations to be corrected at its expense."

In entering summary judgment in favor of Amoco, the trial court found that paragraph 17 of the Exchange Agreement did not obligate Amoco to correct the EPA violations on the Premises. The summary judgment order provides:

"The court specifically finds that paragraph 17 of the Exchange Agreement between Bond and Amoco does not apply to environmental contamination on the property which is the subject of this case."

We disagree with the trial court's conclusion that paragraph 17 of the Exchange Agreement does not apply to environmental contamination on the Premises. The plain language of paragraph 17 requires Amoco to correct all health code violations of any governmental authority that exist on the Premises. A code is a systematic collection, compendium or revision of laws, rules, or regulations. (Black's Law Dictionary 233 (5th ed. 1979).) The EPA provides:

"§ 2. (a) The General Assembly finds:

(i) that environmental damage seriously endangers the public health and welfare, as more specifically described in later sections of this Act." 415 ILCS 5/2(a)(i) (West 1992).

"§ 3.02. 'Air pollution' is the presence in the atmosphere of one or more contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life, to health, or to property, or to unreasonably interfere with the enjoyment of life or property." 415 ILCS 5/3.02 (West 1992).

"§ 20. (a) The General Assembly finds:

* * *

(10) that the handling, storage and disposal of hazardous substances and petroleum pose a danger of exposing citizens, property, natural resources and the environment to substantial risk of harm or degradation, that the Agency is authorized by this Act to use public funds to respond to and correct releases of hazardous

substances and petroleum, that by doing such the value of property is enhanced or preserved, that persons should not receive a financial benefit at the expense of public funds when the Agency performs a cleanup, and that establishing environmental reclamation liens on property subject to response or corrective action will help assure that public funds are recompensed." 415 ILCS 5/20(a)(10) (West 1992).

Thus, EPA violations due to leakage from underground gasoline storage tanks causing environmental contamination are clearly health code violations. It follows that it would be a disregard of the plain language of paragraph 17 to not apply the paragraph to EPA violations due to leakage from underground gasoline storage tanks causing environmental contamination.

Amoco argues that Bond "attempts to pull and stretch an innocuous piece of boilerplate designed to deal with routine municipal code violations to the point where it will cover a cleanup costing $1,000,000." In the first instance, the purported $1 million cost to Amoco is irrelevant. There is no provision for cost limitation in paragraph 17. It is also irrelevant as to whether paragraph 17 is boilerplate; the fact is that paragraph 17 is in the Exchange Agreement whether it is boilerplate or verse. In addition, paragraph 17 does not provide that it is limited to municipal code violations. Rather, paragraph 17 states that it applies to violations from any "other governmental authority." A State of Illinois EPA violation is plainly a violation from a governmental authority other than a city or village. There is therefore no merit to Amoco's argument.

Amoco also argues that "if the court considers the extrinsic evidence as to the intent of the parties as to the meaning of paragraph 17 of the Exchange Agreement, it will find that neither Walgreens nor Amoco intended for paragraph 17 to apply to environmental contamination." This argument is also irrelevant because the terms in paragraph 17 are clear and unambiguous.

When contract terms are clear and unambiguous, they must be given their ordinary and natural meaning, and no parol or extrinsic evidence may be considered to vary the meaning of the terms. (*Rothner v. Mermelstein* (1991), 219 Ill. App. 3d 502, 508, 579 N.E.2d 1022, 1027.) It follows that Amoco's argument is unavailing.

■ We next address whether the trial court erred in awarding rescission of the Exchange Agreement "due to a mutual mistake of fact (the huge unforeseen costs of the environmental clean-up)." In support of the trial court's ruling, Amoco states: "In the present case, both parties were mistaken about a material matter at the time they entered into the Exchange Agreement in 1984: the economic conse-

quences of having a petroleum leak from an underground storage tank."

We disagree with the trial court and Amoco that the Exchange Agreement should be rescinded because of a mutual mistake of fact. There was no mutual mistake of fact in this case. Rather than a mutual mistake of fact, this case involves a unilateral mistake in the cost to be incurred for performance of the contract. Unlike a mutual mistake of fact, a unilateral mistake in the cost to be incurred for performance of the contract is not a basis for rescission.

If the parties to a contract make assumptions as to the cost to be incurred for performance of the contract, mistakes in those assumptions will not be cause for rescinding the contract because each party assumes the risk that their assumption as to the cost of performance was wrong. A contract fairly entered into cannot be avoided or disregarded by one of the parties because he discovers that the contract is less profitable to him than he anticipated when he entered into it. (*Diedrich v. Northern Illinois Publishing Co.* (1976), 39 Ill. App. 3d 851, 857-58, 350 N.E.2d 857, 862.) In *Diedrich*, the court agreed with the Michigan Supreme Court when it stated: "It is quite possible that for various reasons plaintiff's investment did not turn out as well as its officers had hoped and expected. If such is the situation equitable relief by way of rescission may not be granted unless plaintiff was defrauded, or was induced to make the contract in question by misrepresentations, on the part of defendant or his agent, as to material facts." (39 Ill. App. 3d at 858, 350 N.E.2d at 862-63.) We agree with *Diedrich* and the statement by the Michigan Supreme Court.

Moreover, the record in the present case manifests that prior to entering into the Exchange Agreement Amoco knew that leakage from underground gasoline storage tanks could discharge contaminants into the environment. Amoco had developed a policy to eliminate public and Amoco risks associated with leaking underground gasoline storage tanks. Amoco would give its gas station dealers directions as to that policy. The reasons given were pollution, safety and avoidance of the legal risks that could be involved. In addition, before the Exchange Agreement was executed, when selling gas station sites, Amoco used a bill of sale that warned the vendee of the health and safety hazards of underground gasoline storage tanks, and it used an indemnification agreement rider under which the vendee agreed to indemnify Amoco against claims "arising out of the ownership or use of tanks."

It follows that Amoco knew of the existence and consequences of underground gasoline storage tanks and how to protect itself

contractually from such risks prior to negotiating and entering into the Exchange Agreement in this case. If Amoco made a mistake in entering into the contract, it was not a mistake as to a material fact in the contract but rather a mistake in the cost of performing its contractual obligations. The mistake that Amoco made is therefore not cause for rescinding the contract. *Diedrich*, 39 Ill. App. 3d at 857-58, 350 N.E.2d at 862.

■ The trial court also ruled that the Exchange Agreement should not be enforced because enforcement would be unconscionable. The doctrine of unconscionability, however, is not applicable here. No equitable principle, including unconscionability, will compel the cancellation of a valid contract merely because one of the parties thereto will possibly or probably sustain a loss. Where the parties to an instrument are competent to contract with each other, and there is no question of fraud, neither can be relieved from his agreement on the ground that he did not use good business judgment in entering into the contract. (6 Ill. L. & Prac. *Cancellation of Instruments* § 5 (1954).) Moreover, Amoco is required to bear the cost of correcting the contamination from the underground gasoline storage tanks pursuant to EPA regulations whether or not the Exchange Agreement is enforced.

In addition, if the Exchange Agreement is enforced according to its terms, Bond will merely receive what it is supposed to receive under the Exchange Agreement. It will not receive a windfall or some type of serendipitous benefit. This is especially true since Bond deposited the total purchase price in an escrow account, paid Amoco's lessee of the Premises $100,000 for a waiver of first refusal with respect to purchasing the Premises, and prior to the scheduled closing Bond allowed Amoco to use a portion of the escrow funds to acquire the exchange tract for another gas station site. Thus, there is nothing unconscionable about enforcing the Exchange Agreement.

Under the circumstances, it is clear that the trial court erred in ruling that the Exchange Agreement should not be enforced pursuant to the doctrine of unconscionability. The doctrine of unconscionability is not applicable to this case.

Accordingly, the summary judgment in favor of Amoco is reversed. The denial of Bond's motion for summary judgment is also reversed. The trial court is to conduct another hearing and reconsider Bond's motion and the relief requested, taking into account what is stated herein. The case is remanded for further proceedings consistent with this opinion.

Reversed and remanded with directions.

GREIMAN, P.J., and TULLY, J., concur.