SIXTH DIVISION

June 8, 2001

No. 1-00-0961

BOND DRUG COMPANY OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 90 CH 07176

)

AMOCO OIL COMPANY, ) The Honorable

) Stephen A. Schiller,

Defendant-Appellant. ) Presiding Judge.

JUSTICE BUCKLEY delivered the opinion of the court:

This case arises out of a 1984 real estate transaction in which defendant-appellant Amoco Oil Company (Amoco) agreed to transfer a service station site to plaintiff-appellee Bond Drug Company of Illinois (Bond) in exchange for properties worth $1,175,000.  When Amoco failed to comply with the terms of the parties' agreement, Bond sued for specific performance and Amoco counterclaimed for rescission.  On cross-motions for summary judgment, Judge Hourihane entered judgment in favor of Amoco, denied Bond's motion, and rescinded the contract.  On appeal, this court reversed summary judgment in favor of Amoco, reversed the denial of Bond's motion for summary judgment, and remanded the case with directions for the trial court "to conduct another hearing and reconsider Bond's motion and the relief requested, taking into account what is stated herein."  
Bond Drug Co. v. Amoco Oil Co.
, 274 Ill. App. 3d 630, 636 (1995).  On remand, the trial court granted Bond's motion for summary judgment and ordered specific performance of the contract.  Amoco now appeals and raises the following issues:  (1) whether the trial court complied with this court's mandate; (2) whether paragraph 17 of the exchange agreement applies to the environmental contamination on the premises; (3) whether the exchange agreement should be rescinded due to mutual mistake of fact; (4) whether enforcement of the agreement is unconscionable; and (5) whether the trial court properly ordered specific performance on remand.

I. BACKGROUND

On December 21, 1984, Amoco entered into a contract (the Exchange Agreement) with Bond concerning a parcel of real estate owned by Amoco located at the corner of Fairbanks and Ohio Streets (the Premises) in Chicago.  At the time, the Premises was occupied by an Amoco gas station pursuant to an Amoco lease agreement and contained underground gasoline storage tanks.  Bond, a subsidiary and real estate arm of Walgreen Company (Walgreen), wanted to acquire the Premises as a site for a Walgreen drug store.

The Exchange Agreement provided that Bond would deposit the purchase price of $1,175,000 into an escrow account; that the escrow funds would thereafter be used by Bond to acquire property or properties as designated by Amoco in exchange for the Premises; that the exchange property or properties would have an aggregate value of approximately $1,175,000; that the final closing under the Exchange Agreement was to take place two years after Bond deposited the $1,175,000 in the escrow account; and that at the final closing Amoco would convey title to the Premises to Bond and Amoco would receive any amount of money remaining in the escrow account.  In addition, paragraph 17 of the Exchange Agreement provided that if zoning, building, fire or health code violations were found to exist on the Premises prior to Bond taking title and possession, Amoco would correct them.

After executing the Exchange Agreement, Bond paid $100,000 to Amoco's gasoline station lessee of the Premises for a waiver of the lessee's right of first refusal on any sale of the Premises by Amoco.  On October 7, 1985, Bond deposited the $1,175,000 into the escrow account.  In 1986, Amoco designated property it desired in Wauwatosa, Wisconsin, which was purchased by Bond for Amoco with funds from the escrow account.  Amoco has since had use and possession of that tract for a gas station.  Bond has not purchased any other properties under the Exchange Agreement and the remainder of Bond's funds remain in the escrow account.

In September 1987, shortly before the final closing under the Exchange Agreement, Amoco notified Bond that Amoco wanted to test the Premises for groundwater contamination that might have been caused by leaking underground gasoline storage tanks.  Thereafter, because of Amoco's requests, the final closing was repeatedly deferred.  On May 27, 1988, Amoco found that there was environmen-tal contamination on the Premises that would have to be corrected.  On April 17, 1989, pursuant to the Illinois Environmental Protection Act (EPA) (415 ILCS 5/57 
et seq.
 (West 1996)), the Illinois Environmental Protection Agency (IEPA) sent Amoco a notice of discharge or release of petroleum into the environment at the Premises caused by leaking underground gasoline storage tanks.  

On November 17, 1989, Amoco advised Bond that it would not convey the Premises to Bond as provided in the Exchange Agreement and that it considered the Exchange Agreement terminated because of the unexpected cost of having to correct the Premises contamina-tion.
(footnote: 1)  Attempts by Bond to persuade Amoco to fulfill the terms of the Exchange Agreement failed.  On July 23, 1990, Bond filed an action against Amoco seeking specific performance of the Exchange Agreement.  On August 27, 1990, Amoco answered and asserted a coun-terclaim for rescission based on mutual mistake and impossibility.  Both parties filed motions for summary judgment.  The trial court granted summary judgment in favor of Amoco and denied Bond's motion for summary judgment. Bond appealed.  On appeal, this court reversed the trial court's decision as to both Amoco's and Bond's summary judgment motions and remanded the case.  
Bond Drug Co. v. Amoco Oil Co.
, 274 Ill. App. 3d 630 (1995) (hereinafter 
Bond I
).

Bond I
 decided the following issues.  First, with respect to whether paragraph 17 of the Exchange Agreement applied to the environmental contamination on the Premises, 
Bond I
 held "[t]he plain language of paragraph 17 requires Amoco to correct all health code violations of any governmental authority that exist on the Premises" and that "EPA violations due to leakage from underground gasoline storage tanks causing environmental contamination are clearly health code violations."  
Bond I
, 274 Ill. App. 3d at 633-34.  Second, with respect to whether the trial court erred in awarding rescission of the Exchange Agreement due to a mutual mistake of fact, 
Bond I
 held "[t]here was no mutual mistake of fact in this case.  Rather than a mutual mistake of fact, this case involves a unilateral mistake in the cost to be incurred for performance of the contract" and "is not a basis for rescission."  
Bond I
, 274 Ill. App. 3d at 635.  Finally, with respect to whether the court correctly ruled that the Exchange Agreement should not be enforced because enforcement would be unconscionable, we held that the doctrine of unconscionability did not apply and stated:

"No equitable principle, including unconscion-ability, will compel the cancellation of a valid contract merely because one of the par-ties thereto will possibly or probably sustain a loss. Where the parties to an instrument are competent to contract with each other, and there is no question of fraud, neither can be relieved from his agreement on the ground that he did not use good business judgment in entering into the contract. [Citation.]  More-over, Amoco is required to bear the cost of correcting the contamination from the under-ground gasoline storage tanks pursuant to EPA regulations whether or not the Exchange Agree-ment is enforced. 

In addition, if the Exchange Agreement is enforced according to its terms, Bond will merely receive what it is supposed to receive under the Exchange Agreement. It will not receive a windfall or some type of serendipit-ous benefit. This is especially true since Bond deposited the total purchase price in an escrow account, paid Amoco's lessee of the Premises $100,000 for a waiver of first refusal with respect to purchasing the Pre-mises, and prior to the scheduled closing Bond allowed Amoco to use a portion of the escrow funds to acquire the exchange tract for another gas station site. Thus, there is nothing unconscionable about enforcing the Exchange Agreement."  
Bond I
, 274 Ill. App. 3d at 636.

Bond I
 concluded:

"[T]he summary judgment in favor of Amoco is reversed. The denial of Bond's motion for summary judgment is also reversed. The trial court is to conduct another hearing and recon-sider Bond's motion and the relief requested, taking into account what is stated herein. The case is remanded for further proceedings consistent with this opinion."  
Bond I
, 
274 Ill. App. 3d at 636.

Appeal to the Illinois Supreme Court was denied.  See 
Bond Drug Co. v. Amoco Oil Co.
, 164 Ill. 2d 558 (1995).

On remand, the case came before Judge Stephen A. Schiller.  The parties appeared before Judge Schiller for the first time on February 28, 1996.  Bond argued that all the trial judge had left to do was enter a summary judgment order in its favor and "to shape the order."  Amoco argued that the judge was to review our determination with regard to the issue of unconscionability, which the judge refused to do.  Judge Schiller determined that our opinion foreclosed his determination of many of the issues on the summary judgment and that he was left "to consider the relief requested."  Nevertheless, the judge granted the parties the opportunity to file supplemental briefs on Bond's original summary judgment motion.  

The next hearing took place before Judge Schiller on June 18, 1996.  At the hearing, the judge asked Amoco which factual issues survived the determinations made in 
Bond I
.  Amoco responded that the remaining issues of fact were unconscionability and rescission based on a mutual mistake.  After considering the supplemental briefs, the additional affidavits submitted by Amoco, and the arguments of the parties, Judge Schiller concluded:

"[Counsel for Amoco] has conceded – and I think quite properly so, and I think in the best tradition of advocacy – that what he sees as the two remaining factual issues, that of unconscionability, that of mutual mistake.  The Appellate Court [in 
Bond I
] has made four-cornered, square findings on those issues.  The only thing I can grapple with in terms of what is raised in the affidavits and the argu-ments that appears not to be covered by the mandate of the Court is potentially – and I believe I am reaching to try to find something the possibility of impossibility
(footnote: 2), and I find that that issue is not fairly before me given the pleadings in this case.  Accordingly, I am going to enter summary judgment for the Plain-tiffs herein both in relation to the affirma-tive defenses and claims of Amoco and with regard to the claims of Bond in the original complaint.

That leaves open the question of remedy.  I am going to give Bond, the Plaintiff ten days to submit to the Court a proposal of remedies, and I am going to give Amoco ten days to object, to file their objections.  I am going to set this cause for hearing on the question of what my dispositive order should be with regard to remedies on that issue alon[e]."

Bond's proposed remedy suggested that Amoco be required to complete remediation of the contamination of the Premises, obtain a "sign-off" letter from the IEPA that the remediation efforts were sufficient, and thereafter convey the property to Bond in accordance with the terms of the Exchange Agreement.  By agreed order entered on March 18, 1997, Amoco was to attempt to obtain from the IEPA a "No Further Remediation" (NFR) letter from the IEPA.  In the meantime, the trial court and the parties waited to see if the IEPA would issue an NFR letter before proceeding further.

On September 21, 1999, the IEPA issued the NFR letter.  The letter provided that "(1) all statutory and regulatory corrective action requirements applicable to the occurrence have been complied with; (2) all corrective action concerning the occurrence has been completed; and (3) no further remediation concerning the occurrence is necessary for the protection for human health, safety and the environment."

On October 29, 1999, after considering further briefs and hearing argument from the parties, the trial court entered its final judgment requiring Amoco to specifically perform its obliga-tions under the Exchange Agreement.  On February 14, 2000, the trial court denied Amoco's motion for reconsideration.

Amoco now appeals.

II. DISCUSSION

A.  Whether Judge Schiller Followed 
Bond I's
 Mandate

Amoco argues that Judge Schiller failed to comply with our mandate.  Specifically, Amoco asserts "the trial court's failure to conduct the required evidentiary hearing is a breach of its duty to follow the appellate court's mandate and grounds for this Court to reverse its decisions and remand the case to fill the many gaps in the record."

It is well established that " 'where the directives of a reviewing court are specific, a positive duty devolves upon the court to which the cause is remanded to enter an order or decree in accordance with the directions contained in the mandate. Precise and unambiguous directions in a mandate must be obeyed.' "  
Puritan Finance Corp. v. Gumdrops, Inc.
, 101 Ill. App. 3d 888, 890 (1981), quoting 
Stuart v. Continental Illinois National Bank & Trust Co.
, 75 Ill. 2d 22, 27-28 (1979), and citing 
Smith v. Farmer's State Bank
, 392 Ill. 456 (1946). 

Here, our directive called for the trial court

"to conduct another hearing and reconsi-der Bond's motion [for summary judgment] and the relief requested, taking into account what is stated herein.  The case is remanded for further proceedings consistent with this opin-ion."  
Bond I
, 274 Ill. App. 3d at 636.

We find that our directive when viewed in context with the opinion and record as a whole is very clear.  We also find that Judge Schiller's actions on remand were completely appropriate and in accord with 
Bond I
's mandate.

Our decision in 
Bond I
 disposed of all of Amoco's arguments against Bond's motion for summary judgment.  Amoco opposed Bond's motion for summary judgment based on the following grounds: (1) paragraph 17 of the Exchange Agreement does not encompass environ-mental contamination; (2) the Exchange Agreement should be rescinded due to mutual mistake of fact regarding the cost to remediate the environmental contamination; (3) enforcing the Exchange Agreement would be unconscionable; and (4) specific per-formance is not an appropriate remedy.  As discussed in detail above, we held in 
Bond I
 that the contamination from the leaking underground storage tanks was a violation under paragraph 17; that there was no mutual mistake of fact; and that the doctrine of unconscionability was not applicable.  Thus, Judge Schiller pro-perly concluded on remand that he was bound by the law of the case with regard to those issues.  Under the law of the case doctrine, a court is bound by its prior rulings of law in opinions or orders in the same case unless the facts require a different interpreta-tion.  
Continental Insurance Co. v. Skidmore, Owings & Merrill
, 271 Ill. App. 3d 692 (1995).

"The rule of the law of the case is a rule of practice, based on sound policy that, where an issue is once litigated and decided, that should be the end of the matter and the unreserved decision of a question of law or fact made during the course of litigation set-tles that question for all subsequent stages of the suit."  
Continental Insurance Co.
, 271 Ill. App. 3d at 696-97.

In light of the above, Judge Schiller properly determined that given our resolution of the issues addressed in 
Bond I
, summary judgment should be granted in favor of Bond.

Moreover, we also note that nowhere in 
Bond I
 did we make reference to the necessity of any type of evidentiary hearing.  Rather, we directed only that a hearing be conducted.  Indeed, con-trary to Amoco's contention, a review of the record demonstrates that Judge Schiller was more than generous with the extent of hearings conducted on remand.  The judge held hearings on whether he should grant summary judgment to Bond giving Amoco every opportunity to present additional evidence appropriate to his consideration of Bond's motion.  The court received affidavits submitted by Amoco in opposition to Bond's motion and expressly noted in its ruling that it was doing so: "In terms of the affidavits it should be noted for the record, I am considering them in terms of my disposition in this case so that the record is absolutely clear."  The court also allowed ample oral argument from counsel.  In addition, after granting judgment in favor of Bond on the issue of liability, Judge Schiller requested Bond submit a proposed remedy and allowed Amoco time to file objections thereto.  Ultimately, the parties entered an agreed order on the issue of obtaining the NFR letter from the IEPA.  After receipt of the letter and after considering further briefs and further argument of the parties, the court entered its final judgment.

Accordingly, we conclude that Judge Schiller complied with 
Bond I
's mandate.

      B. Issues Related To Paragraph 17, Mutual Mistake, and                Unconscionability

With respect to Amoco's arguments regarding issues previously determined in 
Bond I
, we find that the law of the case precludes our further review.

As stated by our supreme court:

" 'Where the Appellate Court *** on the first appeal to it, announces a particular view of the law governing the case and reverses and remands the case for further proceedings in accordance with the views announced, if the case is again brought before such court for review the former decision is binding on the court making it, and the questions decided and determined by it on the first appeal are not open for re-consideration on the second appeal.' " 
PSL Realty Co. v. Granite Invest-ment Co.
, 86 Ill. 2d 291, 312 (1981), quoting 
Zerulla v. Supreme Lodge Order of Mutual Protection
, 223 Ill. 518 520 (1906).

Although we recognize that the law of the case doctrine is "not a limitation on our power to revisit an issue in circumstances where facts have changed or where we determine that our initial decision was clearly erroneous and would work a manifest injustice" (
Harris Trust & Savings Bank v. Otis Elevator Co.
, 297 Ill. App. 3d 383, 388 (1988)), such is not the case here.  

Accordingly, we reject Amoco's attempts to rehash these already resolved issues.

C.  Specific Performance

Finally, Amoco asserts that specific performance is not an appropriate remedy.  We disagree.

"[W]here a contract is fairly and under-standably entered into, does not contain circumstances of fraud or oppression, and involves only the sale and transfer of real estate, specific performance is allowable as a matter of right.  [Citation.]  That right is not absolute, but rests within the sound discretion of the circuit court. [Citations.]  As the decision rests within the sound discre-tion of the circuit court, this court will reverse only upon a showing of an abuse of that discretion."  
Vincent v. Vits
, 208 Ill. App. 3d 1, 4 (1991).

Amoco's first argument is that specific performance is an inappropriate remedy because it requires the court to "impermis-sibly insert terms and obligations into the Exchange Agreement that the parties had not agreed to."  Amoco asserts "ordering specific performance requires that Paragraph 17 of the Exchange Agreement be interpreted to encompass costs from environmental violations" and that such costs should not be included.  However, this issue has already been conclusively determined in 
Bond I
.  Paragraph 17 encompasses environmental violations.  Thus, contrary to Amoco's assertion, the court's order of specific performance is not imper-missibly inserting terms and obligations into the Exchange Agreement.  

Amoco also asserts that specific performance is an inappropri-ate remedy because there are "numerous outstanding issues between the parties, particularly with regard to the requirement in Paragraph 21 of the Exchange Agreement that the Premises 'shall be returned to a mutually agreed upon condition'  prior to closing."  However, as noted by Bond, the mutually agreed-upon condition (
i.e.
, the cleanup of the contamination on the property) has been achieved.  The IEPA has issued the NFR letter and the property is ready for conveyance.  Indeed, the parties agreed to wait for the issuance of the NFR letter before proceeding with the hearing on the remedy.

Amoco's final argument is that specific performance would lead to an unjust result citing the amount of money spent in the remediation of the Premises and the increase in the Premises' value from 1984 to the present.  First, as noted in 
Bond I
, Amoco's "mistake" as to the cost of remediating the Premises is not a basis for rescinding the contract.  There is nothing unconscionable about enforcing the Exchange Agreement, as Bond will merely receive what it contracted for.  Second, the purchase price was established by the parties under the Exchange Agreement.  As for the increase in the value of the Premises, we agree wholeheartedly with Bond and find that Amoco has no basis to complain about the change in value of the property because of its refusal for 16 years to convey the property to Bond.

III.  CONCLUSION

Accordingly, for the reasons stated above, we hereby affirm the trial court's grant of summary judgment and order of specific performance in favor of Bond.

Affirmed.

O'Brien and Gallagher, concur.

FOOTNOTES
1:  As of the time of the first appeal, Amoco had spent $532,000 to clean up the Premises contamination and surmised that it could cost as much as an additional $500,000 to complete the job.  As of March 30, 1996, Amoco had spent $1,011,096.53 in remediation costs.  The remediation of the Premises was completed on September 21, 1999.

2:   
Bond points out that Amoco argued the issue of impossi-bility at the hearing on Bond's motion and for many months there-after.  Amoco asserted that its performance under the Exchange Agreement was impossible because it could take in excess of 30 years to clean up the contamination.